IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

OLLIE LEON HARMON III,               )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )     Civil Action No. 3:08-CV-799
                                     )
CB SQUARED SERVICES                  )
INCORPORATED,                        )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION
### (Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendant's Motion for Summary Judgment)

This case involves an alleged violation of the Employee Polygraph Protection Act

("EPPA"), 29 U.S.C. §§ 2001, *et. seq.*, by Defendant CB Squared Services Incorporated

("CB Squared"). Plaintiff Ollie Leon Harmon, a former employee of CB Squared,

contends that Defendant wrongfully asked him to take a polygraph examination and

unlawfully terminated him based on the test's results. The case is currently before the

Court on Plaintiff Harmon's Motion for Partial Summary Judgment (Dkt. 30) on Counts I

and II of his Complaint and Defendant CB Squared's Motion for Summary Judgment

(Dkt. 36) on all counts. The parties have filed memoranda of law and exhibits in support

of their respective positions. The Court will dispense with oral argument because the

facts and legal contentions are adequately presented in the materials presently before the

Court. For the reasons detailed herein, Plaintiff's Motion for Partial Summary Judgment

will be granted and Defendant's Motion for Summary Judgment will be denied.

**I.**

Defendant CB Squared provides automotive maintenance services at several "Jiffy Lube" franchises that it owns and operates in and around the Commonwealth of Virginia. Plaintiff Harmon first entered Defendant's employ in the summer of 2007, when he was hired as a service technician at the company's Garrisonville, Virginia location. By December of 2007, Plaintiff had been promoted to a managerial position at another CB Squared facility in Virginia and soon thereafter was serving as Defendant's general "Customer Relations Manager" with responsibility for a number of Defendant's service centers throughout Virginia.

Plaintiff's career with CB Squared progressed steadily until early October of 2008, when Plaintiff informed several CB Squared executives that an individual identified only as "Chris" had offered Plaintiff a job with "STC", a competing Jiffy Lube franchisee. Concerned that STC had violated the Jiffy Lube franchise agreement, Mike Day, the President of CB Squared, contacted STC to investigate Plaintiff's allegations. After a representative of STC assured Day that no one from the company had approached Harmon, Day sought to "corroborate [Plaintiff's] claims" of misconduct by an STC employee. Accordingly, Day "asked Plaintiff if he would voluntarily submit to a polygraph test"—a request to which Plaintiff apparently agreed. Def. Br. in Supp. at 4.

On October 14, 2008, CB Squared's "Operations Manager", Jason Russ, informed Plaintiff that the polygraph test would be given in Richmond, Virginia the next day. Accompanied by Russ, Plaintiff traveled to Richmond on October 15 where the polygraph

examination was administered. Other than written directions to the polygraph test site, CB Squared provided Plaintiff with no documents or other information in advance of the examination. Harmon Dec. at 2. Rather, on the day of the exam, the polygraph examiner provided Plaintiff with a two-page "Polygraph Consent Form" detailing the examination procedures and a two-page "Polygraph Standards of Practice" form explaining Plaintiff's rights under Virginia law. *See Id.* Ex. 1. Both of these documents were signed only by Plaintiff and the polygraph examiner, who was not a CB Squared employee. *See Id.*

Following the test, Day and several other CB Squared executives met with Plaintiff on October 16, 2008 and informed him that the results of his polygraph examination revealed "deception". Def. Br. in Supp. at 4. After Plaintiff refused to divulge further information regarding STC's alleged solicitation, CB Squared demoted Plaintiff and reassigned him to a new store location. CB Squared contends that Plaintiff's performance on his polygraph test had no bearing on his reassignment and represents that Plaintiff instead was reassigned due to the company's concerns regarding his "disloyalty, lack of candor, and poor judgment". Def. Br. in Supp. at 5. Dissatisfied with his demotion, Plaintiff provided CB Squared with his "two week notice" of resignation on October 16, 2009 and contends that he was terminated by CB Squared that same day. CB Squared denies terminating Plaintiff, arguing instead that it merely accepted his voluntary resignation.

Plaintiff subsequently instituted the present action, alleging three separate

violations of the EPPA by CB Squared.[1] Specifically, Count I contends that Defendant violated Section 2002(1) of the EPPA by requesting and/or suggesting on October 14, 2008 that Plaintiff take a polygraph examination. *See* 29 U.S.C. § 2002(1). Count II further alleges that CB Squared violated Section 2002(2) of the EPPA when it used, accepted, and referred to the results of Plaintiff's polygraph test at the meeting between CB Squared executives and Harmon on October 16, 2009. *See id.* § 2002(2). Finally, Count III charges that Defendant CB Squared violated Section 2002(3) of the EPPA by terminating his employment on October 16, 2009 on the basis of the polygraph test's results.[2] *See id.* § 2002(3).

Contending that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law on Counts I and II, Plaintiff Harmon subsequently filed his Motion for Partial Summary Judgment on May 9, 2009.[3] Defendant opposes Plaintiff's

---

[1] The EPPA's several prohibitions on the use of polygraph examinations are contained in 29 U.S.C. § 2002, which is divided into four subsections. *See* 29 U.S.C. § 2002(1)-(4). Each subsection of Section 2002 in turn prohibits a different type of employer conduct with regard to the use of polygraph examinations in the workplace. *See, e.g., Id.* § 2002(1) (prohibiting employers from "requir[ing], request[ing], suggest[ing], or caus[ing] any employee . . . to take or submit to any lie detector test."). Though Plaintiff's Complaint does not divide Defendant's several alleged violations of the EPPA into separate counts, the Fourth Circuit has demonstrated a willingness to analyze each alleged violation of Section 2002's four subsections as a distinct claim. *See Worden v. Suntrust Banks, Inc.*, 549 F.3d 334, 339 (4th Cir. 2008) (treating alleged violations of 29 U.S.C. §§ 2002(2) and 2002(3) as separate claims under the EPPA). Accordingly, the Court will refer to Defendant's alleged violation of Section 2002(1) as "Count I", Section 2002(2) as "Count II", and Section 2002(3) as "Count III" for the purpose of analysis.

[2] Plaintiff's Complaint also alleges several violations of Sections 2006 and 2007 of the EPPA. *See* Complaint at ¶ 11; *see also* 29 U.S.C. §§ 2006-2007. These provisions, however, do not restrict an employer's ability to use and rely upon the results of polygraph examinations. Rather, Sections 2006 and 2007 exempt employers from the EPPA's broad prohibition on the use of polygraph examinations in certain, limited circumstances. *See* 29 U.S.C. §§ 2006-2007. Accordingly, the Court will construe the portions of Plaintiff's Complaint alleging "violations" of Sections 2006 and 2007 of the EPPA as an imprecise attempt by Plaintiff to plead the inapplicability of the several exemptions detailed in these sections.

[3] Plaintiff does not seek summary judgment on Count III of his complaint, conceding that whether he resigned voluntarily or instead was improperly terminated by CB Squared remains a disputed issue of material fact.

Motion on several grounds, contending that an arbitration agreement signed by the parties mandates dismissal of this action; that the EPPA does not even apply in this case; and that Plaintiff waived any EPPA claim he may have by lying on his employment application. Defendant CB Squared has also filed its own Motion for Summary Judgment on all counts, relying principally on the same grounds that the company has advanced in opposition to Plaintiff's Motion. Because they raise numerous common legal and factual issues, the Court will consider the parties' motions together.

## II.

The Court may grant either party's motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [the moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts. . . in the light most favorable to the non-moving party." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (internal quotations omitted). Mindful of the applicable legal standard, the Court now considers

Plaintiff Harmon's Motion for Partial Summary Judgment on Counts I and II and

Defendant CB Squared's cross-Motion for Summary Judgment on all claims.

## III.

### A.

Defendant CB Squared first contends that Harmon's Motion for Partial Summary

Judgment must be denied—and its own Motion for Summary Judgment granted—

because Harmon failed to submit his EPPA claims to arbitration as required by a dispute

resolution agreement that he signed upon joining CB Squared in 2007. *See* Def. Br. in

Supp. Ex. A. This Court previously rejected this exact same argument when it denied

Defendant's Rule 12(b)(6) Motion to Dismiss. *See* Mem. Op. of Jan. 29, 2009 at 6-7.

The Court explained then that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*,

requires a party seeking enforcement of an otherwise-valid arbitration agreement—such

as the dispute resolution agreement signed by Plaintiff—to petition the Court for a stay of

the proceedings and an order compelling arbitration, not outright dismissal of the action.

*See* 9 U.S.C. §§ 3-4. Defendant has made no such petition in this case.

In support of its argument that Plaintiff's failure to comply with the terms of the

arbitration agreement mandates outright dismissal of his EPPA claims, Defendant relies

principally on *Saari v. Smith Barney, Harris Upham & Co.*, 968 F.2d 877 (9th Cir.

1992).[4] In *Saari*, however, the Ninth Circuit held only that a general arbitration

---

[4] Defendant also cites several Virginia state cases for the proposition that "a plaintiff has no right of action for damages *for breach of contract* where he himself has breached the contract." Def. Br. in Supp. at 7 (emphasis added) (citing *ADC Fairways Corp. V. Johnmark Construction, Inc.*, 231 Va. 312 (Va. 1986)). Because Plaintiff

agreement was not invalidated by Section 2005(d) of the EPPA, which provides that "the rights and procedures provided by [the EPPA] may not be waived by contract or otherwise . . . ." 29 U.S.C. § 2005(d). Nowhere does *Saari*—or the FAA, for that matter—mention dismissal as a possible remedy for a plaintiff's failure to arbitrate his claims. Indeed, the conclusion reached by the Ninth Circuit in *Saari* demonstrates that Defendant's reliance on the case is misplaced: instead of dismissing the plaintiff's claim for failure to arbitrate, the Ninth Circuit in *Saari* concluded that "the district court erred in denying [the defendant's] motion to compel arbitration and to stay the case pending arbitration." *Saari*, 968 F.2d at 882.

Despite the Court's earlier admonition and explanation, Defendant has never sought to compel arbitration in this case. Nor has Defendant cited any authority that would permit this Court to disregard the clear language of Section 3 of the FAA and dismiss, rather than stay, this action. *See* 9 U.S.C. §3. Instead, Defendant merely restates the same argument it advanced—and the Court expressly rejected—at the Rule 12(b)(6) stage. Assuming that the arbitration agreement signed by Plaintiff is even valid under the express terms of the EPPA,[5] the document nonetheless provides no basis for either granting Defendant's Motion for Summary Judgment or denying Plaintiff's Motion for

---

advances no breach of contract claims against Defendant CB Squared, however, the Court need not address Defendant's reliance on these cases.

[5] The Court in unaware of any other federal circuit that has adopted the Ninth Circuit's holding in *Saari v. Smith Barney, Harris Upham & Co.*, 968 F.2d 877, 882 (9th Cir. 1992), that Section 2005(d) of the EPPA does not preclude enforcement of an otherwise-valid arbitration agreement. Further, the fairness of the arbitration agreement signed by Plaintiff is questionable at best, since the its terms require Plaintiff to submit to binding arbitration by a mediation company that is owned and operated by Defendant's counsel in this action.

Partial Summary Judgment.

## B.

Defendant also asks the Court to grant summary judgment in its favor because Plaintiff may have provided misleading information on the employment application he submitted upon joining CB Squared in 2007. On the application, completed on June 29, 2007, Plaintiff represented that he had not been convicted previously of any felony and acknowledged that the company could terminate him for answering falsely. Apparently, Plaintiff had felony weapons charges pending in the District of Columbia at the time. Defendant now argues that because Plaintiff was "about to be convicted of a felony weapons charge" at the time he completed the application, his answer was false and thus "any claim Plaintiff may have against his employer should be barred by the unlawful pretext Plaintiff gave when seeking employment with Defendant". Def. Br. in Opp. at 12.

### 1.

As an initial matter, the record does not demonstrate conclusively that Plaintiff actually made any false statements on his employment application. When asked "Have you ever been convicted of a felony?", Defendant responded "No". Def. Br. in Opp. Ex. C at 50. Plaintiff's deposition testimony indicates that he was not convicted of the felony at issue until some point *after* completing the employment application and joining CB Squared in mid-2007. *Id.* at 30, 32. Defendant's own evidence thus suggests that Plaintiff's statement may have been technically true at the time he completed the employment application in June of 2007. At the very least, whether Plaintiff's statement

8

was in fact false when he completed the employment application remains a genuine issue of material fact that precludes summary judgment based on this issue at this stage.

2.

Even if Plaintiff's alleged falsehood gave CB Squared cause to terminate him, Defendant has not explained why Plaintiff's misstatements would excuse it from all liability under the EPPA's several provisions that prohibit employer conduct. The EPPA proscribes more than merely terminating an employee based on the results of a polygraph examination. *See* 29 U.S.C. § 2002(3). Unless one of the EPPA's narrow exceptions applies, the statute further prohibits an employer such as Defendant from even asking an employee to take the exam in the first instance or from discussing or referring to the exam's results. *See id.* § 2002(1)-(2).

In the present case, Plaintiff alleges that Defendant violated the EPPA not only by terminating him but also by requesting that he submit to a polygraph and by discussing the test's results with him on October 16th. Compl. ¶ 11. Plaintiff's statement—assuming it was, in fact, false and gave Defendant cause to terminate him—did not also give CB Squared license to disregard the clear provisions of the EPPA by asking Harmon to take a polygraph and by referring to and discussing the test's results with him at the October 16th meeting. Accordingly, Plaintiff's alleged misstatement on his employment application provides no basis for granting Defendant CB Squared's Motion for Summary Judgment on Counts I and II of Plaintiff's complaint, which allege violations of the EPPA by CB Squared beyond Plaintiff's improper termination.

9

3.

CB Squared similarly contends that Plaintiff's false statement bars Count III of his

Complaint, a claim for improper termination under Section 2002(3) of the EPPA, as a

matter of law. Defendant fails to recognize, however, that the impact of Plaintiff's

alleged false statement on his claim for improper termination is likely covered by what

has been termed the "after-acquired evidence doctrine."[6] *See McKennon v. Nashville*

*Banner Publishing Co.*, 513 U.S. 352, 360-63 (1995).

According to the Fourth Circuit, the after-acquired evidence doctrine "concerns the

effect of evidence of employee misconduct acquired by the employer after the employee

has been terminated" for an improper reason—precisely the factual scenario presented in

this case. *Miller v. AT&T Corp.*, 250 F.3d 820, 837 (4th Cir. 2001) (quoting *McKennon*,

513 U.S. at 362-63). Though the Court is unaware of any reported decisions that apply

the doctrine to claims under the EPPA,[7] other courts have applied it broadly to claims for

improper termination under other provisions of Title 29 of the United States Code. *See,*

*e.g., McKennon*, 513 U.S. at 360-63 (applying doctrine to employee's claim for unlawful

termination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §

---

[6] In *Worden*, 549 F.3d 334 (4th Cir. 2008), the Fourth Circuit instructed district courts to apply the familiar "mixed-motive" framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), to EPPA cases where an employer contends that its reasons for terminating an employee were unrelated to the employee's performance on a polygraph examination. Unlike the defendant in *Worden*, however, CB Squared does not contend that it had an independent basis for terminating Plaintiff. Rather, Defendant argues that it did not actually terminate Plaintiff at all but that it *could have* done so based on his prior false statements. Accordingly, the framework dictated by *Worden* does not control this issue.

[7] Perhaps this is due, in part, to the "paucity of EPPA case law" noted by the Fourth Circuit in *Worden*, 549 F.3d at 339.

621 *et seq.*); *Miller*, 250 F.3d at 836-38 (quoting *McKennon* and applying the doctrine to

claim for wrongful termination under the Family and Medical Leave Act ("FMLA"), 29

U.S.C. §§ 2601-2654); *Wallace v. Dunn Const. Co.*, 62 F.3d 374, 378 (11th Cir. 1995)

(en banc) (applying doctrine to claim for violation of the Equal Pay Act ("EPA"), 29

U.S.C. § 206(d)(1)); *see also Russell v. Microdyne Corp.*, 65 F.3d 1229, 1238 (4th Cir.

1995) (applying doctrine to claim for unlawful sex discrimination under Title VII, 42

U.S.C. §§ 2000e-17).  Because the EPPA—like the ADEA, EPA, and Title VII—is

similarly "but part of a wider statutory scheme to protect employees in the workplace

nationwide", *McKennon*, 513 U.S. at 357, the Court finds the after-acquired evidence

doctrine instructive as to the effect of Plaintiff's alleged falsehood on his ability to claim

wrongful termination under the EPPA.

Applying the doctrine in the context of the FMLA, the Fourth Circuit has

explained its effect: "evidence of employee wrongdoing acquired after wrongful

termination may limit an award of back pay (and disentitle an employee to front pay and

reinstatement)".  *Miller*, 250 F.3d at 836.  It is therefore "unambiguously" clear that "the

impact of after-acquired evidence is limited to remedial matters alone", not an employer's

underlying liability for an employee's unlawful termination.  *Russell*, 65 F.3d at 1238 n.8

(comparing *McKennon*, 513 U.S. at 360-63 with *Smallwood v. United Airlines*, 728 F.2d

614 (4th Cir. 1984)).  Thus, even if Defendant can show that Plaintiff's false statement

subjected him to termination, Harmon at least "would remain eligible for wages lost . . .

through . . . the date on which the new information was discovered, irrespective of any

after-acquired evidence of wrongdoing." *Russell*, 65 F.3d at 1241 (internal quotations omitted). In any event, his falsehood would not bar his claim for unlawful termination in Count III entirely as a matter of law as Defendant claims.

Accordingly, Plaintiff's allegedly false statements on his CB Squared employment application do not require summary judgment either against Harmon or in favor of CB Squared on the issue of Defendant's liability for Plaintiff's allegedly improper termination. Moreover, Defendant has not yet provided the Court with a sufficient basis to conclude that any damages suffered by Plaintiff must necessarily be limited as a matter of law by the after-acquired evidence doctrine. *See McKennon*, 513 U.S. at 362-63 (requiring employer to "first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."). Accordingly, summary judgment in CB Squared's favor on the issue of damages is likewise inappropriate at this time.

## C.

Defendant CB Squared also seeks summary judgment on the issue of punitive damages, cursorily arguing in a single paragraph: "under any rational analysis, punitive damages are not appropriate" because Defendant's alleged violation of the EPPA does "not rise to the level of malicious or reckless violations of the law." Def. Br. in Supp. at 14 (internal quotations omitted). The Court is unaware of—any Defendant has failed to cite—any authority holding (or even suggesting) that punitive damages are not available under the EPPA. *Cf. Lyles v. Flagship Resort Dev. Corp.*, 371 F.Supp.2d 597, 609

(D.N.J. 2005) (declining to decide whether punitive damages are available under the EPPA). The statute provides that an employer violating the EPPA "shall be liable for such legal or equitable relief as may be appropriate, including, *but not limited to*, employment, reinstatement, promotion, and the payment of lost wages and benefits." 29 U.S.C. § 2005(c)(1) (emphasis added). The statute itself, then, neither expressly provides for nor explicitly precludes punitive damages. Given Defendant's sparse, almost offhand argument, the Court is unable to conclude that it has carried its burden of demonstrating that punitive damages are unavailable under the EPPA as a matter of law.

## IV.

Counts I and II of Plaintiff's Complaint charge Defendant CB Squared with violating the EPPA by causing Plaintiff to take a polygraph exam on October 15, 2008 and by using, accepting, and referring to the results of the examination at the October 16 meeting. *See* 29 U.S.C. § 2002(1)-(2). Both parties now seek summary judgment on Counts I and II, each contending that the absence of any genuine issues of material fact demonstrate that it is entitled to judgment as a matter of law on both counts.[8]

### A.

#### 1.

Defendant CB Squared first argues that Harmon's Motion for Partial Summary Judgment on Counts I and II should be denied—and its own Motion for Summary Judgment granted— because Plaintiff's claims are outside the scope of the EPPA.

---

[8] Plaintiff appears to seek summary judgment only on the issue of Defendant's liability, not damages.

Because STC, not Plaintiff, was the ostensible target of Defendant's investigation, CB Squared urges the Court to "construe the terms of the EPPA narrowly and hold that Plaintiff's claim was not one [Congress] intended to fall within its parameters." Def. Br. in Opp at 9; Def Br. in Supp. at 8.

Defendant's characterization of the EPPA misconstrues the statute's boundaries. The EPPA's comprehensive prohibitions on the use of polygraphs were intended "to eliminate the denial of employment opportunities by prohibiting the least accurate yet more widely used lie-detector tests, preemployment and random examinations, and providing standards for and safeguards from abuse during tests not prohibited." S. Rep. No. 100-284, at 39 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 726, 726. In broad, clear language qualified only by the narrow exceptions detailed in Sections 2006 and 2007, Section 2002 of the EPPA forbids an employer to:

> (1) directly or indirectly, require, request, suggest, or cause *any employee* or prospective employee to take or submit to any lie detector test; [or]
> (2) to use, accept, refer to, or inquire concerning the results of any lie detector test of *any employee* or prospective employee . . ..

29 U.S.C. § 2002(1)-(2) (emphasis added). Nothing in the statute's language expressly imposes—or even suggests—a further requirement that an employee first show that he is the target of an employer's investigation to invoke the protections of the EPPA. Moreover, Congress's repeated use of the phrase "any employee" throughout Section 2002 evinces its intent that the EPPA's protections apply broadly in the workplace. *See* 29 U.S.C. § 2002(1)-(4). Because the Fourth Circuit has expressed a willingness to

14

construe the EPPA according to its plain language, *see Worden*, 549 F.3d at 345-46

(interpreting language of Section 2002(2) according to its "ordinary, contemporary,

common meaning"), the Court must reject the additional requirement urged by the

Defendant here. The EPPA is thus fully applicable in the case at hand.

2.

Defendant further argues that it is entitled to summary judgment on Counts I and II

because the polygraph test results allegedly played no role in Harmon's demotion,

reassignment, and potential constructive discharge. The Fourth Circuit, however, has

made it clear that an employer's liability for unlawfully discharging an employee under

Section 2002(3) of the EPPA is "not a condition precedent" for establishing a violation of

the EPPA's other sections. *Worden*, 549 F.3d at 346-47. Rather, each subsection of

Section 2002 stands on its own and "constitutes an independent basis for asserting the

liability of an employer" under the EPPA. *Id.* at 346. Thus, even if the results of

Plaintiff's polygraph results played no role in Defendant's decision to demote and

reassign him (something that is far from clear at this stage), Plaintiff may still maintain

separate and independent claims against CB Squared for other violations of Section 2002

of the EPPA.

**B.**

Defendant CB Squared also contends that Harmon's Motion for Partial Summary

Judgment must be denied because the EPPA's narrow "ongoing investigation exception"

allowed the polygraph examination in this case.[9] Def. Br. in Opp at 8. This "limited"

exemption allows polygraphs if "the test is administered in connection with an ongoing

investigation involving economic loss or injury to the employer's business, such as theft,

embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage."

29 U.S.C. § 2006(d). Harmon responds that the ongoing investigation exception does not

apply in this case because Defendant was investigating only a potential violation of the

Jiffy Lube franchise agreement by STC, not an economic loss or injury that had already

occurred. Pl. Br. in Supp. at 7; *see also* 29 C.F.R. § 801.12 (explaining what qualifies as

a sufficient "economic loss or injury" under the EPPA).

Assuming, without deciding, that CB Squared was investigating a qualifying

economic loss or injury to its business, Plaintiff's uncontroverted evidence nonetheless

establishes that Defendant cannot rely on the ongoing investigation exemption to avoid

liability as a matter of law in this case. To invoke the exemption, the employer must

execute a detailed statement and provide it to the examinee-employee at least 48 hours

before administration of the examination. 29 U.S.C. § 2006(d)(4); 29 C.F.R. §

801.12(g)(2). This statement must, *at a minimum*, "set forth with particularity the specific

incident or activity being investigated and the basis for testing particular employees." 29

U.S.C. § 2006(d)(4)(A); *see also* 29 C.F.R. § 801.12(g)(3) (explaining detail required in

statement). The statement must further identify the specific economic loss or injury to the

---

[9] Defendant does not cite the ongoing investigation exception as a basis for granting its own Motion for Summary Judgment on all counts.

employer's business and describe the basis of the employer's reasonable suspicion that the examinee-employee was involved in the incident in question. 29 U.S.C. § 2006(d)(4)(D)(i)-(iii). Additionally, the statement provided to the examinee must be signed by the employer or some representative of the employer—other than the polygrapher—with authority to bind the employer legally. 29 U.S.C. § 2006(d)(4)(B); 29 C.F.R. § 801.12(g)(4).

Plaintiff's uncontradicted evidence establishes that Defendant CB Squared cannot rely on the ongoing investigation exemption to justify this polygraph exam. According to Plaintiff, the only document provided to him in advance of the October 15 polygraph examination was a map and written directions to the testing site in Richmond, Virginia. On the day of the examination, the polygrapher provided Plaintiff with just two additional documents. The first, a "Polygraph Consent Form", explained the nature of the examination, that the test results may be disclosed, and certain of Plaintiff's legal rights. The second, a "Polygraph Standards of Practice" form, explained his  legal rights under Virginia law. *See* Harmon Dec. Ex. 1. at 1-4. Defendant has responded with no evidence indicating that Plaintiff received any other written materials related to the polygraph examination of October 15. *See* Def. Ans. to Int. at 9.

That these three documents were not provided to Plaintiff 48 hours in advance of his polygraph test would, by itself, be sufficient to deny Defendant refuge in the EPPA's ongoing investigation exemption. *See* 29 U.S.C. § 2006(d)(4); 29 C.F.R. § 801.12(g)(2). Scrutiny of the documents themselves, however, reveals that they fail to satisfy many of

the exemption's numerous and strict requirements. Nowhere, for example, do the documents mention the incident being investigated or CB Squared's basis for suspecting Plaintiff's involvement. *See* 29 U.S.C. § 2006(d)(4)(A); *see also* 29 C.F.R. § 801.12(g)(3). Nor is there any indication that the documents are signed by an employee of Defendant, much less an employee with the authority to legally bind CB Squared. *See* 29 U.S.C. § 2006(d)(4)(B); 29 C.F.R. § 801.12(g)(4). In fact, Plaintiff's unrebutted evidence suggests that the polygraph examiner himself signed the documents in direct contravention of the ongoing investigation exemption's requirements. *See* Harmon Dec. at 2; *see also* 29 U.S.C. § 2006(d)(4)(B); 29 C.F.R. § 801.12(g)(4).

The Court thus need not reach the issue of whether STC's alleged solicitation of Harmon constituted an economic loss or injury to CB Squared sufficient to invoke the EPPA's ongoing investigation exemption. Plaintiff's unrebutted evidence reveals that Defendant seems to have made no attempt to comply with the numerous, detailed requirements of the exemption as detailed Section 2006(d). CB Squared therefore cannot invoke the exemption to avoid liability under the EPPA and thereby defeat Plaintiff's Motion for Partial Summary Judgment on Counts I and II.

## C.

Plaintiff contends that he is entitled to partial summary judgment on the issue of Defendant's liability on Counts I and II, which allege that Defendant violated Sections 2002(1) and 2002(2) of the EPPA by asking Plaintiff to take a polygraph examination and subsequently using, accepting, and referring to the exam's results. Defendant's own

18

evidence, Plaintiff argues, demonstrates that CB Squared's executives requested on

October 14, 2008 that he take a polygraph examination and then accepted, referred to, and

discussed the exam's results with him just two days later. Defendant's briefs do not

substantively respond to Plaintiff's argument. The Court will consider each count in turn.

1.

In Count I, Plaintiff alleges a violation of Section 2002(1) of the EPPA, which

forbids any employer "directly or indirectly, to require, request, suggest, or cause any

employee to take or submit to any lie detector test". 29 U.S.C. § 2002(1). Plaintiff's

evidence indicates that CB Squared's President, Mike Day, "asked [him] to take a

polygraph test in order to ascertain the veracity of [his] claim" that someone from STC

had solicited him. Harmon Dec. at 2. Though Defendant now argues that "Plaintiff . . .

voluntarily agreed to undergo a polygraph test" to aid CB Squared's investigation, Day's

own affidavit states: "I asked Plaintiff if he would voluntarily submit to a polygraph test .

. .." Day Dec. at 2. And when asked during his deposition whether he had "asked

[Harmon] to take a polygraph test", Day responded: "Yes". Day Dep. at 42-43.

The coverage of the EPPA is broad—an employer violates Section 2002(1) by

merely suggesting, even indirectly, that an employee submit to a polygraph. *See* 29

U.S.C. § 2002(1). Whether the Court construes Day's own characterization of his

communication to Harmon as a direct request or merely an indirect suggestion, it still

contravenes the plain language of Section 2002(1). That Harmon may have "voluntarily"

agreed to Day's request that he take a polygraph examination is immaterial—the statute

does not require that an employee refuse the examination as a precondition to bringing suit. Both parties' evidence thus demonstrates the absence of any genuine issue of material fact as to whether Day requested—or at least indirectly suggested—that Plaintiff submit to a polygraph. Because such a request is sufficient to render Defendant liable under Section 2002(1), Plaintiff Harmon is entitled to judgment as a matter of law on Count I.

2.

Count II charges CB Squared with a violation of Section 2002(2) of the EPPA, which provides that it is unlawful for an employer such as CB Squared "to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee". 29 U.S.C. § 2002(2). The Fourth Circuit has construed the phrase "refer to", as it is used in the EPPA, to mean "to direct attention to or allude." *Worden*, 549 F.3d at 347 n.11 (internal quotations omitted).

Plaintiff's evidence indicates that Day referenced the results of Plaintiff's test in violation of Section 2002(2) at the October 16th meeting when Day informed Plaintiff that he had failed the polygraph exam at issue because his results revealed "deception". Harmon Dec. at 2. Defendant's own evidence only confirms Plaintiff's account: Day, Defendant's President, states in an affidavit that he "met with Plaintiff and informed him of the results of his polygraph test". Day Dec. at 2-3. Defendant's evidence further reveals that several other CB Squared employees were also present at the October 16th meeting and that they discussed the Plaintiff's test results amongst themselves. Russ Dep.

20

at 45-48. It is undisputed, then, that CB Squared employee's at least alluded to—and in fact, openly discussed—the results of Plaintiff's polygraph in violation of Section 2002(2). *See Worden*, 549 F.3d at 347 n.11.

Plaintiff also alleges in Count II that CB Squared violated Section 2002(2) by accepting the results of his polygraph exam. The Fourth Circuit has interpreted the term "accept", as it is employed in Section 2002(2), to "mean[] something other than mere unsolicited receipt." *Worden*, 549 F.3d at 346. Accepting polygraph results in violation of Section 2002(2) thus seems to require some sort of affirmative act or involvement by the employer. *See id.* (finding that "accept" as used in 2002(2) "involve[s] action by the employer greater than passive receipt.").

Unlike the situation confronted in *Worden*, it is undisputed here that CB Squared took an active role in procuring the polygraph at issue. Indeed, both parties' evidence indicates that CB Squared not only suggested that Plaintiff take the test but also arranged to have the test administered and had another employee accompany Plaintiff to the testing site. Day Dec. at 2; Harmon Dec. at 2. Since CB Squared's employees subsequently received, considered, and discussed the test's results, it is clear that Defendant actively accepted them in violation of Section 2002(2).

Because both parties' evidence demonstrates conclusively that CB Squared both accepted and referred to the results of Plaintiff's polygraph examination, no genuine issue of material fact remains as to whether CB Squared violated Section 2002(2) of the EPPA. Accordingly, Plaintiff is likewise entitled to judgment as a matter of law on the issue of

CB Squared's liability under Count II.

## V.

Count III of Plaintiff's Complaint charges CB Squared with violating the EPPA by improperly terminating him based on the results of his polygraph examination. Section 2002(3) of the EPPA broadly prohibits employers from discharging, disciplining, discriminating against, or otherwise denying employment or promotion to employees on the basis of polygraph results. *See* 29 U.S.C. § 2002(3).[10] Though Plaintiff concedes that outstanding issues of material fact preclude summary judgment on this issue, Defendant contends that Plaintiff's voluntary resignation following the October 16, 2009 meeting entitles it to summary judgment on Count III.

## A.

Plaintiff Harmon first responds that summary judgment is inappropriate on Count III because CB Squared actually terminated him when it immediately accepted his two-week notice at the October 16th meeting. But Plaintiff's contention that he was "terminated" because CB Squared accepted his resignation on October 16 instead of permitting him to work until October 30, the end date he specified in his two-week notice, lacks merit. Defendant has presented uncontroverted evidence indicating that CB Squared paid Harmon in full through October 30, 2008 even though it did not permit him to return to work physically after he resigned on October 16. *See* Day Dep. at 68-69. Plaintiff cannot now claim that he was actually discharged by CB Squared after he

---

[10] Plaintiff avers only that he was discharged based on his polygraph results. Compl. ¶ 11.

resigned and received full pay for the remaining two-week period.  Instead, as discussed

below, *see* Part V.C, *infra*, Plaintiff's decision to resign at the October 16th meeting is

best analyzed as a potential  "constructive discharge" under the EPPA.

**B.**

1.

Citing *Wells v. North Carolina Board of Alcohol Control*, 714 F.2d 340 (4th Cir.

1983), Plaintiff next argues that CB Squared is not entitled to summary judgment because

he need not even show that he was actually or constructively terminated to recover.

Rather, Harmon contends, he may recover under Section 2002(3) as long as he can

demonstrate that his resignation was somehow generally "related to" Defendant's

violation of any part of the EPPA.

Plaintiff's reliance on *Wells* for the proposition that he need only show his

resignation was broadly "related to" a violation of the EPPA to recover for wrongful

termination likewise misses the mark.  *Wells*, a Title VII case, considered only whether an

employee was entitled to back pay after his existing back injury was exacerbated by his

employer's discriminatory refusal to promote him from a labor-intensive position to a

new job that required no heavy lifting.  *See Wells*, 714 F.2d at 341-42.  After his

employer's discriminatory refusal to promote him, the plaintiff in *Wells* subsequently

resigned because his injury made work too difficult.  *Id.*

Because the employee in *Wells* resigned, his employer contended that he was

entitled to back pay only if his resignation qualified as a constructive discharge in

23

violation of Title VII. *Id.* at 341. The employer in *Wells*, however, conceded that its previous discriminatory refusal to promote the plaintiff constituted an independent violation of Title VII. For this reason, the Fourth Circuit concluded that the plaintiff in *Wells* was entitled to back pay irrespective of whether the employer's failure to promote the plaintiff also qualified as a constructive discharge in further violation of Title VII. *Id.* at 342.

The situation confronted by the Fourth Circuit in *Wells* is thus distinguishable from the case at bar. Missing from this case is the adverse employment action conceded by the *Wells* defendant that underpinned the Fourth Circuit's conclusion that the employee need not make a further showing of constructive discharge. *Id.* at 342. Even under the *Wells* analysis, Plaintiff must first show some underlying adverse employment action in violation of Section 2002(3) of the EPPA to recover on Count III for wrongful discharge.

CB Squared, however, admits no adverse employment action in violation of Section 2002(3). Plaintiff himself concedes that genuine issues of material fact make resolution of the question inappropriate on summary judgment. Because Plaintiff admittedly resigned from CB Squared on October 16th, the Court must initially consider whether that resignation could in fact constitute a constructive discharge of Plaintiff in violation of Section 2002(3) of the EPPA. It can then be determined whether Plaintiff can recover or whether Defendant instead is entitled to summary judgment on Count III of Plaintiff's Complaint. *See* Part V.C, *infra.*

24

2.

To recover for improper termination under the EPPA, Plaintiff must, of course, also show that he was discharged (constructively or otherwise) "on the basis of" his polygraph examination. *See* 29 U.S.C. § 2002(3). Even if Plaintiff was constructively discharged, Defendant CB Squared contends, the company is entitled to summary judgment because its decision to reassign and demote Plaintiff "was made independent of the polygraph test." Def. Br. in Supp at 5.

Plaintiff, however, has presented considerable evidence which could support a conclusion by the trier of fact that his polygraph test was at least "a factor" in his demotion. *See Worden*, 549 F.3d at 341 (holding that a plaintiff need only show that the results of a polygraph examination "were a factor in the termination of employment" and rejecting requirement that results be the "sole factor" for employee's discharge). Plaintiff took the polygraph examination on October 15, 2008 and Day, Defendant's President, confronted Plaintiff with the test's results at a meeting the very next day. At the conclusion of that same meeting, after discussing the results of the test with Plaintiff, Defendant's executives collectively made the decision to demote him. Such evidence, if proven, would tend to rebut Defendant's bald assertion that Plaintiff's demotion was unrelated to his polygraph results.

Despite Defendant's denial, Plaintiff's evidence thus shows that the polygraph test could be construed as at least a factor in the decision to reassign Plaintiff. *See id.* Accordingly, a genuine issue of material fact remains as to whether Plaintiff was

constructively discharged "on the basis of" his polygraph test on October 16, 2008.

## C.

Though the Defendant argues that Virginia law does not recognize a claim for constructive discharge, it fails to understand that the EPPA is a federal statute. Under federal law, an employee suffers a constructive discharge when an "employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984) (considering constructive discharge under Title VII).[11] "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (analyzing constructive discharge in ADEA action).

### 1.

An employer's actions can only be considered sufficiently deliberate if they "were intended by the employer as an effort to force the employee to quit." *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds*, 467 U.S. 867 (1984). The evidence in the present case is unsettled on this issue. Therefore, a genuine issue of material fact remains as to whether CB Squared officials acted with a specific intent to force Harmon to leave when they demoted and reassigned

---

[11] No reported Fourth Circuit decisions consider the issue of constructive discharge in the context of the EPPA. Nonetheless, the well-established concept of constructive discharge has been applied broadly in many other types of employment-related cases and the Court will therefore apply it in this case. *See Mennen v. Easter Stores*, 951 F.Supp. 838, 857-58 (N.D.IA. 1997) (considering whether employee was constructively discharged following employer's violation of the EPPA).

him at the October 16th meeting. *See J.P. Stevens & Co., Inc. v. NLRB*, 461 F.2d 490, 494

(4th Cir.1972) (requiring "proof of the employer's specific intent to force an employee to

leave" to support a claim for constructive discharge).

CB Squared has produced evidence indicating that the decision to demote and

reassign Harmon to one of their Fairfax, Virginia locations was based not on his

polygraph test results but instead on the company's belief that Harmon's refusal to

provide additional information demonstrated a need for increased supervision for a period

of 30 to 60 days. *See* Day Dep. at 71-73; Brar Dep. at 54-61. Defendant's evidence

further indicates that CB Squared executives offered Harmon the option of working at a

closer location in Garrisonville, Virginia after he complained that the commute to Fairfax

in the mornings was prohibitively long. Brar Dep. at 61-63. Such attempts to

accommodate Plaintiff's needs could be construed by the trier of fact as inconsistent with

an intent to force Plaintiff to resign. *See Holsey*, 743 F.2d at 209 (holding that

employer's intent may be inferred through circumstantial evidence).

In his account of the October 16th meeting, however, Plaintiff denies that CB

Squared executives offered him the option of working at the Garrisonville location.

Instead, he counters, Defendant's executives offered him only the option of working at

their Fairfax, Virginia service center despite knowing of his inability to make it to work

on time due to his childcare responsibilities. Harmon Dec. at 2; Harmon Dep. at 104-08;

*see also Bristow*, 770 F.2d at 1255 (an employer's intent "may be inferred through . . . a

failure to act in the face of known intolerable conditions . . ..").

Plaintiff's evidence, if proven at trial, could rebut Defendant's contention that it sought to accommodate Plaintiff and had no intent of forcing his resignation.  A genuine issue of material fact thus remains regarding whether CB Squared's actions were a good-faith attempt to reassign Plaintiff or part of an effort to "set [him] up for failure" and thereby force him to resign because of his performance on the polygraph examination. Harmon Dec. at 2.

2.

Even if Harmon can demonstrate that CB Squared acted with the requisite intent to support a claim of constructive discharge, he must further demonstrate that his new employment conditions were objectively intolerable. *Bristow*, 770 F.2d at 1255. Defendant argues here that Plaintiff cannot demonstrate that his new working conditions were objectively intolerable because his evidence shows, at best, that he was merely required to report to work on time at a single CB Squared facility like all other employees. Def. Br. in Supp. at 11.

The Fourth Circuit "does not permit an employee's subjective perceptions to govern a claim of constructive discharge". *Bristow*, 770 F.2d at 1255.  Instead, intolerability "is assessed by the objective standard of whether a 'reasonable person' *in the employee's position* would have felt compelled to resign". *Id.* (emphasis added). Generally, "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).  But an

employee's reassignment or "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Id.* (citing *Jurgens v. EEOC*, 903 F.2d 386, 391-92 (5th Cir.1990)).

Plaintiff's evidence indicates that his previous position as a "customer experience manager" was quite different from that of CB Squared's other employees. Specifically, Plaintiff's deposition testimony suggests that he had an ongoing understanding with CB Squared that he was not required to be at any particular store location by any specific time in the morning. Because his previous position required him to travel to various service centers throughout Virginia, CB Squared considered Plaintiff "at work" as long as he was "on the road" to his assigned store by a certain time each morning. Harmon Dep. at 106.

The parties apparently reached this agreement so that Plaintiff could drop his young children off at daycare at 6:30 a.m. each morning before traveling to the various CB Squared locations for which he was responsible. Harmon Dep. at 105-09. According to Plaintiff's deposition testimony, CB Squared executives knew he would be unable to reach the Fairfax, Virginia location on time each morning and therefore assigned him there to "set[][him] up for failure" and subsequent termination. *Id.* CB Squared, in turn, has responded with evidence that its executives offered Plaintiff the option of working at their Garrisonville service center, which is apparently close to Plaintiff's home. Brar Dep. at 62-63. Plaintiff, however, contends that he was told that he would be permitted to work only at the Fairfax location—Garrisonville was not an option. Harmon Dep. at 108.

Though an employee's subjective dissatisfaction with a new job assignment cannot

29

support a claim for constructive discharge, the Court must consider "whether a 'reasonable person' *in the employee's position* would have felt compelled to resign". *Bristow*, 770 F.2d at 1255 (emphasis added). Plaintiff, previously in a position that granted him the flexibility necessary to travel to various CB Squared locations throughout the state, has come forward with evidence demonstrating that he was subsequently demoted and reassigned to a location far from his home that he would likely be unable to reach in time to begin work each morning. Harmon thus has presented sufficient evidence to permit a trier of fact to conclude that his new assignment in Fairfax was objectively intolerable. *See Carter*, 33 F.3d at 459 (finding that a demotion that is "essentially a career-ending action or a harbinger of dismissal"can constitute objectively intolerable work conditions). Because Plaintiff's evidence, if believed, could prove that his demotion and reassignment constituted a constructive discharge, summary judgment in favor of Defendant on Count III is inappropriate at this time.

## VI.

The Court thus concludes that Plaintiff Harmon has demonstrated that no genuine issues of material fact remain and that he is entitled to judgment as a matter of law on Counts I and II of his Complaint. Accordingly, Plaintiff Harmon's Motion for Partial Summary Judgment will be granted and Defendant CB Squared's Motion for Summary Judgment as to Counts I and II will be denied. Because genuine issues of material fact remain regarding Plaintiff's termination, Defendant CB Squared's Motion for Summary Judgment on Count III must likewise be denied. Accordingly, this case will proceed to

trial on the limited issues of CB Squared's liability under the EPPA for its alleged

wrongful termination of Harmon and any resulting damages suffered by Plaintiff.   An

appropriate Order will accompany this Memorandum Opinion.


/s/

Henry E. Hudson
United States District Judge


ENTERED this 1st day of June, 2005
Richmond, VA

31